J-S54044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: B.B., a Minor Child | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.W., Natural Mother | No. 382 WDA 2016 |

Appeal from the Order entered February 19, 2016,
in the Court of Common Pleas of Fayette County,
Orphans' Court, at No(s): 19 Adopt 2014

| | |
|---|---|
| IN RE: ADOPTION OF: N.W., a Minor Child | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.W., Natural Mother | No. 383 WDA 2016 |

Appeal from the Order entered February 19, 2016,
in the Court of Common Pleas of Fayette County,
Orphans' Court, at No(s): 20 Adopt 2014

BEFORE: BENDER, P.J.E., OTT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED AUGUST 31, 2016**

M.W. ("Mother") appeals from the Orders granting Petitions filed by Fayette County Children and Youth Services ("CYS" or the "Agency") to involuntarily terminate her parental rights to her dependent, minor children, B.B. (a male born in February 2012) and N.W. (a female born in July 2009) (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A.

§ 2511(a)(2), (5), (8), and (b).[1]  We affirm.

The trial court set forth the relevant factual background and procedural history of this case in two Opinions, which we adopt as though fully set forth herein.  *See* Trial Court Opinion (Adoption of B.B.), 2/10/16, at 1-5; and Trial Court Opinion (Adoption of N.W.), 2/10/16, at 1-6.

On February 19, 2016, the trial court entered the Orders involuntarily terminating Mother's parental rights to the Children.  On March 11, 2016, Mother timely filed Notices of Appeal along with Concise Statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother presents the following issues for our review:

1. Whether the Trial Court erred in finding that … [CYS] met [its] burden by clear and convincing evidence, with regard to 23 Pa.C.S.A. [§] 2511(a)(2), (5), and (8)[,] sufficient to support termination of Mother's parental rights[?]

2. Whether the Trial Court erred in failing to consider the progress that Mother had made on her family service plan and the recommendations of the services provider, Family Solutions[,]  to return the [C]hildren to Mother[?]

3. Whether the Trial Court erred in failing to consider [] Mother's ability to provide essential parental care for the [Children,] when Mother has a third child that remains in her custody and care[?]

4. Whether the conditions that led to the original removal and placement of the [] [C]hildren continue to exist[?]

---

[1] Also in the Orders, the trial court terminated the parental rights of (1) J.B., the father of B.B.; and (2) R.H., the father of N.W.  R.H. has not filed an appeal from the termination of his parental rights, nor is he a party to the present appeal.  J.B. has filed a separate appeal from the termination of his parental rights at Docket No. 391 WDA 2016, which is listed before this panel.

5. Whether [] Mother's rights were terminated simply because of the behaviors of the [f]ather, and not because of anything [] Mother had done or not done[?]

6. Whether [CYS] purposefully thwarted [] Mother's ability to make progress on her family service plan?

7. Whether [CYS] caused delay and failed to provide services and assistance to Mother as required, which in turn prevented [] Mother from remedying the conditions that led to placement within a reasonable period of time?

8. Whether [] Mother had remedied the conditions that led to placement and removal within a reasonable period of time, but [CYS], nonetheless[,] failed to work toward reunification of the [Children] with Mother?

9. Whether the Trial Court erred in granting this termination when the testimony from [CYS] is that the [C]hildren will be separated from their siblings, after the adoption proceeding?

10. Whether the Trial Court erred in finding that [] termination would be in the [] Children's best interest, considering all of the relevant factors?

Mother's Brief at 4.[2]

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. **In re: R.J.T.**, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often

---

[2] Mother stated her issues on appeal somewhat differently in her Concise Statements, in that each concise statement pertained to a single child. We, nevertheless, find her issues preserved for our review.

- 3 -

stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some internal citations omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained that

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (citation omitted).

- 4 -

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with a consideration of section 2511(b).  *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  In the instant case, the trial court terminated Mother's parental rights under section 2511(a)(2), (5), (8), and (b).  We will focus on subsection 2511(a)(8) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(8)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

We will first address Mother's first nine, related issues together, insofar as they concern the trial court's determination that termination of her parental rights was warranted under section 2511(a)(8).

> [Subsection] (a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child's] removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the [child's] removal continue to exist, despite the reasonable good faith efforts of [the Agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [Agency] services.

*In re J.F.M.*, 71 A.3d 989, 993 (Pa. Super. 2013) (citation omitted).

In her first two issues, Mother argues that "[d]espite the fact that the [C]hildren have been dependent for at least the past twelve months, [CYS] has failed to establish that the conditions which led to placement have not been eliminated, as [CYS] has admitted that Mother did complete her initial [family] service plan ["FSP"], alleviating the issues which led to the initial placement (alleged abuse by [Mother's] paramour)." Mother's Brief at 12. Mother argues that the trial court failed to consider the evidence that she had taken substantial steps toward satisfying her FSP objectives and the recommendation of the services provider, Family Solutions, that the placement goal for the Children should be reunification. *Id.* at 14. In her third issue, Mother asserts that the trial court failed to consider her ability to provide essential parental care for the Children, pointing out that she has a

- 6 -

third child who remains in her custody and care.  *Id.* at 15.  In her fourth issue, Mother alleges that the trial court erroneously failed to acknowledge that the conditions that led to the original removal and placement of the Children no longer exist.  *Id.* at 15-16.  In her fifth issue, Mother contends that the trial court improperly terminated her rights simply because of the behavior of the Children's respective fathers, and not because of any action or failure on her part.  *Id.* at 16-17.

In her sixth issue, Mother asserts that CYS purposefully thwarted her ability to make progress on her FSP objectives by failing to update the FSP and to heed the recommendations of her service providers to pursue reunification between Mother and the Children.  *Id.*  In her seventh issue, Mother contends that CYS caused delay and failed to provide services and assistance to her as required.  *Id.*  She further asserts that CYS's failure prevented her from completing her FSP requirements within a reasonable time.  *Id.*  In her eighth issue, Mother alternatively argues that she had remedied, within a reasonable time, the conditions that led to the placement and removal of the Children, but CYS failed to work toward reunification of the Children with her.  *Id.*  In her ninth issue, Mother contends the trial court erred in terminating her parental rights where the testimony from CYS established that the Children will be separated from their siblings after the adoption proceeding.  *Id.* at 18-19.

In its Opinions, the trial court concisely addressed and rejected Mother's above-mentioned claims, determining that CYS presented clear and convincing evidence that termination of Mother's parental rights to the Children under section 2511(a)(8) was warranted. **See** Trial Court Opinion (B.B.), 2/10/16, at 7-9; Trial Court Opinion (N.W.), 2/10/16, at 9-11. The court's factual findings are supported by the record, and its legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of S.P.**, **supra**. Accordingly, we rely on the trial court's rationale in rejecting Mother's first nine issues, and in determining that the requirements of subsection 2511(a)(8) have been met by clear and convincing evidence. **See** Trial Court Opinion (B.B.), 2/10/16, at 7-9; Trial Court Opinion (N.W.), 2/10/16, at 9-11.[3]

Next, we review the termination of Mother's parental rights under section 2511(b). In her tenth and final issue, Mother argues that the trial court erred in finding that termination would be in the best interest of the Children. Mother's Brief at 19.

The focus in terminating parental rights under section 2511(a) is on the parent, but, under section 2511(b), the focus is on the child. **In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

---

[3] With regard to Mother's contention that CYS did not make reasonable efforts to provide her with services to avoid the termination of her parental rights, it is well established that a trial court is not required to consider reasonable efforts in relation to a decision to terminate parental rights. **In the Interest of: D.C.D.**, 105 A.3d 662, 675 (Pa. 2014). Thus, Mother's argument does not entitle her to relief.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

In conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has also has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. ***In re K.Z.S.***, 946 A.2d 753, 764 (Pa. Super. 2008). Moreover, it is appropriate to consider a child's bond with his or her foster parent. ***See In re: T.S.M.***, 71 A.3d at 268.

In addition, in ***In re: T.S.M.***, our Supreme Court set forth the process for evaluation of the existing bonds between a parent and a child, and the necessity for the court to focus on concerns of an unhealthy attachment and the availability of an adoptive home. The Supreme Court stated the following:

[C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g., R.J.T.*, [9 A.3d at 1190] (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

[The Adoption and Safe Families Act of 1997, P.L. 105-89] ASFA[,] was enacted to combat the problem of foster care drift, where children … are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. *See In re R.J.T.*, 9 A.3d at 1186; *In re Adoption of S.E.G.*, [901 A.2d 1017, 1019 (Pa. 2006)]. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. *See*[] 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).

*In re: T.S.M.*, 71 A.3d at 268-69.

In its Opinions, the trial court addressed Mother's challenge concerning section 2511(b) and determined that CYS presented clear and convincing evidence that termination of Mother's parental rights would best serve the Children's needs and welfare. *See* Trial Court Opinion (B.B.), 2/10/16, at 9-12; Trial Court Opinion (N.W.), 2/10/16, at 11-15. Again, the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of S.P.*, *supra*. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")). We conclude that Mother's argument regarding section 2511(b) lacks merit, and, therefore, affirm the trial court's Order, with regard to subsection (b), based on the trial court's Opinions. *See* Trial Court Opinion (B.B.), 2/10/16, at 9-13; Trial Court Opinion (N.W.), 2/10/16, at 11-15.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2016

**IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA**

IN RE: ADOPTION OF N███ W███

ORPHANS' COURT DIVISION

2014
No. 20 ADOPT 2015

FILED
2016 1:56:05 PM
REGISTER OF WILLS
FAYETTE COUNTY
PENNSYLVANIA
Inst Num:        20160173

# OPINION

Anthony S. Dedola, Jr., Esq., for Fayette County Children and Youth Services
Wendy L. O'Brien, Esq., for M███ W███, Natural Mother of N███ W███
R███ H███ pro se, Natural Father of N███ W███
Sarah E. Connelly, Esq., for N███ W███

LESKINEN, J.

Before this Court is the Petition for Involuntary Termination of Parental Rights, hereinafter "Petition," filed by Petitioner, Fayette County Children and Youth Services, hereinafter "FCCYS," on May 14, 2015. Petition was filed on behalf of N███ W███ a minor child, and it seeks to terminate, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8), the parental rights of N███'s biological father, R███ H███, hereinafter "Father," and N███'s biological mother, M███ W███, hereinafter "Mother." A number of hearings were held on the matter, including June 30, 2014; August 8, 2014; December 5, 2014; December 15, 2014; and January 16, 2015. This Court heard testimony from FCCYS and Mother; Father had notice of these proceedings, but was neither present nor represented at the hearings.[1] Additionally, FCCYS submitted a brief on August 25, 2015, in support of termination, and Mother submitted a brief dated October 27, 2015, in opposition to the termination; Father did not submit a brief.

---

[1] Father is currently serving a 15 to 40 year sentence at SCI Mahanoy in Frackville, PA. Anthony Dedola, attorney for FCCYS, stated on the record that Father has been properly served at SCI Mahoney; however, Father did not respond. *See* Trial Tr. 5, Aug. 8, 2014.

1

After consideration of the record and current case law, this Court hereby grants the FCCYS Petition for Involuntary Termination of Parental Rights.

## BACKGROUND

The subject child is N████ A██████ W███, born on June 10, 2009. As a result of a dependency hearing, N████ was adjudicated dependent and removed from the custody of Mother and her paramour, J█████ B████████, hereinafter "Bo██████," and placed in foster care. She currently resides with her foster parents, J██ and K███ B████████, hereinafter "Foster Parents," with B████████, her younger sibling.[2] According to FCCYS and witnesses presented at hearings, N████ has a bond with her foster parents. Foster Parents have expressed their intention to adopt N████ if the FCCYS Petition is granted. At the time she was removed from the home, N████ lived with Mother and Bo██████. Father is currently serving a 15 to 40 year sentence at SCI Mahoney in Frackville, PA, for numerous sex offenses against K█████ W███, another minor child of Mother,[3] which occurred on June 9, 2009. Father has not demonstrated any attempt to maintain contact with N████ up to the filing of the Petition, nor has he shown any interest in these proceedings.

FCCYS became involved with N████ on September 10, 2011, when they received a Child Protective Services report indicating physical abuse and neglect. Investigation revealed that N████ had numerous bruises and fractures about her body,

---

[2] B████████ B████████ is the child of Mother and Bo██████. The proceedings referenced in this opinion pertain to both children; however, the Petition for Involuntary Termination of Parental rights of B████████ B████████, *In re Adoption of B████████ B████████*, 19 ADOPT 2015, are addressed in a separate opinion.
[3] Prior to the filing of this Petition, K█████ W███ was adjudicated dependent, and placed with her natural father; K█████ W███ is not an interested party in this case. *See* Trial Tr. 59, Dec. 5, 2014.

2

along with other various injuries.[4] There was also an indication of previous abuse of Nicole.[5] Through their investigation, FCCYS determined that Mother and Bo████████ were the abusers. In addition to the abuse and neglect of N████, Bo████████ was indicated in a Child Protective Services referral for abuse of K██████ W████ Bo████████ was accused of slamming that child's head on the kitchen counter for allegedly spilling toothpaste. Bo████████ was criminally convicted of the offense, which occurred on January 26, 2012. There were also complaints about the condition of the home. Shortly thereafter, the children were removed from Mother and Bo████████'s care as a result of the aforementioned dependency hearing.

As part of their Family Service Plan, Mother and Bo████████ were required to attend counseling, maintain appropriate housing, and to cooperate with FCCYS. Visitation began at FCCYS, and was gradually increased to include unsupervised home visitations. Early in 2013, Barbara Wright, the family's caseworker, acknowledged that Mother and Bo████████ had made progress toward permanency, with the possibility of returning N████ to the home; however, N████ claimed that in June and August of 2013, during two of the unsupervised home visits, Mother and Bo████████ had inappropriately touched her.[6] While these claims were not founded, the unsupervised home visits were discontinued. Since June 2013, only supervised visits have been conducted, either with FCCYS or through Family Solutions, a private counseling firm.

---

[4] Injuries to the child included small, circular bruises to the head, chest, legs and back; posterior right rib fractures; poor weight gain; elevated liver enzymes; hair loss; and evidence of the drug Seroquel in her system. See Petition for Involuntary Termination of Parental Rights, dated May 14, 2014.
[5] According to FCCYS, medical records indicated that prior concerns of inappropriate bruising of the child occurred in April 2011. See Petition for Involuntary Termination of Parental Rights, dated May 14, 2014.
[6] N████ accused Mother of spanking her in her vaginal area during a home visit in June 2013. Trial Tr. 107, Aug. 8, 2014. A second allegation was levied against Mother and Bo████████ on August 1, 2013. Trial Tr. 108, Aug. 8, 2014. Neither incident of suspected child abuse was founded by FCCYS; however, concern remained as to why N████ would make such allegations in the first place. Id.

3

In addition to the issues identified at the beginning of the dependency, other issues with Mother and Bo████ were subsequently identified. As a result of his conviction for abusing K████ W███, the older child of Mother, Bo████ was placed on probation; however, Bo████ has continually violated his probation as a result of numerous failed drug tests. Mother has also been suspected by FCCYS of "self-medicating" her mental and emotional issues with the use of marijuana, and had numerous positive tests. As of the date of the last hearing, there were continuing concerns regarding drug use and drug-seeking behaviors by Mother and Bo████,[7] additionally, Mother was suspected of seeking out prescription drugs for Bo████,[8] and B████ has been suspected of actively avoiding drug testing by FCCYS.[9]

Furthermore, FCCYS continued to have concerns with certain conditions of the Family Service Plan that were not being met by Mother and Bo████. There were numerous complaints of missed mental health appointments, missed visitations, and the family's housing situation remained a concern.[10] When Mother and Bo████ were unsatisfied with this characterization by Ms. Wright, they were given the "rare" opportunity by FCCYS to change Caseworkers. However, some of the problems persisted after the change was made. Maria Radel, the family's new FCCYS

---

[7] On November 21, 2014, six days after being released from a rehabilitation facility, Bo████ received a prescription for 84 tablets of hydrocodone; during his visit, he did not disclose that he had recently been released from rehab, and gave false information (he stated that he worked as a Diesel Mechanic when he, in fact, was employed at McDonald's). See Trial Tr. 23-25; Dec. 5, 2014.

[8] On December 30, 2014, Mother obtained a prescription for Vicodin; she allegedly exhausted the supply herself. However, on January 5, 2015, Mother did not test positive during a drug test administered by FCCYS; Mother denies giving the medication to Bo████, but admitted to not being forthright with FCCYS about the prescription. See Trial Tr. 106-109; Jan. 16, 2015 (afternoon).

[9] This includes an incident where Bo████ actively avoided drug testing at his home. It was alleged that on December 2, 2014, two Caseworkers from FCCYS (including Ms. Radel) contacted Mother and Bo████ at their home in order to administer a drug test. At one point, Bo████ allegedly asked one of the Caseworkers to step outside momentarily; however, Bo████ got into a vehicle and left the area. See Trial Tr. 157-158; Dec. 5, 2014.

[10] According to Justin Varney of Family Solutions, Mother and Bo████ had 4 different addresses between October 2012 and the hearing on August 8, 2014.

4

Caseworker, continued to report issues regarding missed appointments by Mother and Bo█████, which includes mental health counseling and drug and alcohol counseling. Mother and Bo█████'s missed appointments are concerning not only for their own progress, but for the possibility of success of N████'s therapy and counseling.

As a result of her traumatic history, N████ suffers from various emotional, behavioral, and psychological problems. N████ has been diagnosed with Post Traumatic Stress Disorder, Reactive Attachment Disorder, and phonological disorders (i.e., language issues). N████ exhibits a multitude of behavioral issues, which includes sexualized behavior and "acting out" sexually. As a result of these disorders, N████ has trouble adjusting to normal behavior at home and in daycare, and requires a great deal of therapy and counseling to try and alleviate these issues; Foster Parents have attended counseling and training in order to do so. N████ is said to respond well to Foster Parents, and benefits from their structured home and their patience with her conditions. According to testimony of caseworkers from FCCYS and Family Solutions, Mother has been unable to handle N████'s aggressive behaviors during visits. In fact, N████'s behavior was said to have gotten worse in the year prior to the hearings, and that these behaviors were exacerbated by home visits with Mother and Bo█████.[11]

In addition to continuing concerns regarding missed appointments for treatment and counseling, as well as drug-seeking behavior and drug abuse by Bo█████, the apparent lack of interaction between Mother and Child during visitation is concerning.[12] According to her psychologist, Dr. John Carosso, N████ requires a "stable, loving,

[11] See Trial Tr. 58-59; Aug. 8, 2014.
[12] On January 9, 2015, Elizabeth Giacchetti, Social Worker for CPP Behavioral Health, observed a supervised visitation of Nicole and Mother, and noted her concerns. According to Ms. Giacchetti, there was very little interaction between Mother and Child, and poor eye contact. See Trial Tr. 31-35, Jan. 16, 2015 (morning); see also Ex. B.

consistent environment where she can begin to heal." FCCYS believes that this environment exists in the care of Foster Parents, and questions whether such an environment will be achievable in Mother's care. As a result, FCCYS believes that in the best interests of N████, she should remain with Foster Parents.

At the conclusion of the hearing, Attorney Sarah Connelly, whom the Court appointed to represent the best interests of the child, recommended termination of Mother and Father's parental rights.

## DISCUSSION

Under Pennsylvania law, "In termination cases, the burden is upon [the party seeking termination] to prove by clear and convincing evidence that [his or her] asserted grounds for seeking the termination of parental rights are valid." *In re T.D.*, 949 A.2d 910, 914 (Pa. Super. 2008) (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The Superior Court has further stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*Id.*

Thus, Petitioner, FCCYS, has the burden to prove, by clear and convincing evidence, that the Court should terminate the parental rights of Respondents. Under the statute, grounds for termination, in relevant part, are as follows:

6

§ 2511. Grounds for involuntary termination

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. Stat. and Cons. Stat. Ann. § 2511 (West).

7

The statute sets forth a two-part analysis for termination, which the Superior Court has explained as such:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of C.J.P.*, 114 A.3d 1046, 1049-50 (Pa. Super. 2015).

## PARENTAL RIGHTS OF FATHER

The PA Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" . . . [and] highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(2)." *In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012). Additionally, when deciding whether to terminate rights under § 2511(a)(2), Courts can consider other factors relating to the incarceration; this includes uncertainty of the parent's parole date, and the lack of a bond between parent and child as a result of the period of imprisonment. *Id.* at 831.

Father is currently incarcerated at SCI Mahoney, and is serving a period of incarceration of 15 to 40 years. In addition to the nature of the offenses that caused his current incapacity, it is unlikely that Father will be released from prison in the near

8

future; therefore, he will be unavailable for most, if not all of the time in which Nicole requires his "parental care, control or subsistence." According to FCCYS, there has been no evidence of a bond between Father and N████, no contact between Father and N████, and Father has not demonstrated his intent to preserve his parental rights while incarcerated. Furthermore, Father has not requested counsel, and has not responded to repeated efforts by FCCYS to allow him to participate in termination proceedings.

Because this Court has determined FCCYS has met their burden under § 2511(a)(2), we must consider whether termination is proper under § 2511(b); in the present case, termination of Father's parental rights is appropriate. Due to the nature of Father's incarceration, the length of his current sentence and his lack of demonstrated intent to remain a part of N████'s life, it is apparent that "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). Thus, this Court concludes that no parent-child relationship exists between Father and N████, and that termination of Father's parental rights will have no detrimental effect on the child.

## PARENTAL RIGHTS OF MOTHER

Mother contends that while N████ has been in placement for over 12 months, FCCYS has failed to establish that the conditions which led to placement have not been eliminated;[13] this Court disagrees. As part of N████'s Family Service Plan, first implemented when N████ was adjudicated dependent, Mother was required to attend mental health counseling, maintain appropriate housing, and to cooperate with FCCYS; additionally, there were concerns with Mother's ability to be an appropriate parent, as

---

[13] *See* Respondent's Brief in Opposition to Inv. Termination of Parental Rights, Oct. 27, 2015.

9

well as concerns with Mother and Bo███████'s abuse of N████. It is admitted by FCCYS that in early 2013, Mother had made progress toward getting N████ back into their home, and unsupervised home visitation had begun. However, reunification was never completed; furthermore, according to FCCYS, some of the conditions that led to the initial placement still exist. This includes Mother's failure to regularly attend mental health counseling; Mother and Bo███████'s failure to cooperate with FCCYS in submitting to random drug testing and attending counseling; and concerns regarding appropriate housing and deplorable conditions of the home. Additionally, there remain concerns whether Bo███████'s drug use and Mother and Bo███████'s drug-seeking behavior make it impossible for them to provide a safe home for N████.[14]

Even if Mother was able to prove that even *most* of the conditions that led to placement were remedied, it would not bar involuntary termination under § 2511(a)(8). The Superior Court has held that "where a parent has addressed some of the conditions that led to a child's removal, but other conditions still exist, this element may be deemed to be satisfied." *In re D.A.T.*, 91 A.3d 197, 205-206 (Pa. Super. 2014); *see also In re C.L.G.*, 956 A.2d 999, 1005 (Pa. Super. 2008) ("[A]lthough Mother exhibited substantial progress in meeting the Agency's objectives, she ultimately was unable to care for C.L.G. because, twelve months later, she could not provide the requisite parenting and adequate housing."); *see also In re S.H.*, 879 A.2d 802, 806 (Pa. Super. 2005) (holding mother made significant progress as to certain conditions, but conditions that led to removal continued to exist).

---

[14] One of the reasons for placement, as stated in the Petition, was the presence of the drug Seroquel in N████'s system; FCCYS alleges that Mother and Bo███████ continue to be irresponsible with drugs and prescribed medications.

10

Mother contends that FCCYS is not interested in reunification between Mother and N████ because Mother continues to live with Bo████████. While Mother agreed at the hearing dated January 16, 2015, that her chosen suitors have led to the placement of her children, she nevertheless contends that nothing in her Family Service Plan prevents her from living with Bo███████. In support of Mother's position, FCCYS acknowledged that they are unable to tell Mother "who she can or cannot live with." It is clear, however, that FCCYS has a genuine concern for N████ if she were to be placed into the care of Mother if Bo████████ is present in the home. It is important to note that the reasons for initial placement of N████ included a founded case of child abuse against Mother and Bo████████; furthermore, Bo████████ has a criminal conviction for subsequently abusing K██████ W███, another child of Mother. According to testimony, Bo████████ has not been cooperative with Fayette County Adult Probation, and has tested positive for illegal drugs on numerous occasions; additionally, Bo████████ has not cooperated with FCCYS. Based on the testimony heard by this Court, it is apparent that the continued presence of Bo████████ confirms that one of the "conditions which led to the removal or placement of the child" under § 2511(a)(8) still exists. Thus, FCCYS has met their burden, by clear and convincing evidence, that 12 months or more have elapsed from the date of N████'s placement into foster care, the conditions which led to her placement continue to exist and termination of parental rights would best serve N████'s needs and welfare.

Because this Court has determined that FCCYS has met their burden under § 2511(a)(5) and § 2511(a)(8), we must now consider whether termination is proper under § 2511(b). § 2511(b) "focuses on whether termination of parental rights would

11

best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). Furthermore, the Superior Court has explained:

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

The Supreme Court of Pennsylvania makes it clear that "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *In re T.S.M.*, 71 A.3d 251, 268-269 (Pa. 2013). In deciding whether it is appropriate to terminate rights, "attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy," and the damage this will cause "must be weighed against the damage that bond may cause if left intact." *Id.* at 269.

In the present case, the testimony establishes that N███ has love, comfort, security, and stability with Foster Parents, who have been N███'s primary guardians for nearly four years. N███ continues to receive services to help alleviate her severe mental and emotional disabilities; based on the testimony of N███'s numerous providers, it will be necessary for N███ to receive these services for the foreseeable future. Throughout the period of placement, Foster Parents have ensured that N███ receives the care she needs, with the support of FCCYS and Family Solutions. It is

12

apparent that N████ is currently residing in a caring and stable home with Foster Parents, and has a great opportunity to heal; this Court heard no testimony suggesting otherwise. Furthermore, Foster Parents have made it clear to FCCYS that their intention is to adopt N████.

There was conflicting testimony regarding the significance of the bond between Mother and N████; however, it is clear that any adverse effects of breaking any bond between Mother and N████ are outweighed by the need for N████ to have permanency in a "stable, loving, consistent environment where she can begin to heal." According to testimony, N████ is prone to outbursts, which worsen when she is in the care of Mother; Mother has not been successful at controlling N████'s behavior. Although parenting issues were identified with Mother, these issues have continued to be identified by FCCYS and Family Services, and Mother has been inconsistent with appointments for counseling, which were necessary to effectuate reunification.

As further evidence of a bond, Mother states that N████ identifies her as "mommy" during visits, Mother and N████ exchange hugs and kisses before and after visits, and that Mother has regularly attended visits since N████ was adjudicated dependent. Although a bond may remain between Mother and N████, and this bond is an important consideration, the Superior Court is clear that "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d at 267. While an abused and neglected child may be able to salvage a relationship between her and an abusive parent, it is clear that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re K.K.R.-S*, 958 A. 2d 529, 535 (Pa. Super. 2008)

13

(*quoting In re Involuntary Termination of C.W.S.M.,* 839 A.2d 410, 418–419 (Pa. Super. 2003) (Tamilia, J., dissenting). The Superior Court has explained:

> A child's feelings toward a parent are relevant to the section 2511(b) analysis. Nonetheless, concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent.

*Id.*

In the present case, N█████ has undoubtedly been subjected to emotional and physical abuse by Mother and Bo██████, as was indicated in the initial report on September 10, 2011. As a result of this abuse, N████ has suffered serious trauma and developed numerous debilitating conditions. While N████'s continuing bond with Mother may seem unlikely under these circumstances, it is not unfathomable. What remains clear, however, is that N████'s developmental, physical, and emotional needs will be best served under the care of Foster Parents. Therefore, this Court concludes that terminating the current bond between mother and child can be accomplished without detrimental effects on N████.

Mother contends that the FCCYS Petition should not be granted, because she "has proven herself capable of parenting, by providing a stable home and maintaining appropriate employment to support herself and her youngest child, A████ Bo██████, who remains in her care and custody."[15] Although A████ is currently in the care of Mother, and even if the dependency action regarding A████ has been closed, the relevant questions surround Mother's fitness and ability to parent N████. The Supreme

---

[15] *See* Respondent's Brief in Opposition to Inv. Termination of Parental Rights, Oct. 27, 2015.

14

Court of Pennsylvania has long held that we must look at the unique circumstances leading to the placement of the child in question, and not whether a parent is capable of parenting any child in general. *See generally Matter of Adoption of G.T.M.*, 483 A.2d 1355 n.4 (Pa. 1984) (holding that the issue in the case was not whether the appellee was capable of caring for an infant, but rather whether she could properly care for a child she failed to care for in the past, and that child had special problems and was well beyond the "infant stage" at the time of termination proceedings). This Court has heard no testimony relating to Mother's ability to parent A████, nor would such testimony be relevant in the present case.

## CONCLUSION

Accordingly, this Court finds by clear and convincing evidence that Father's substantial period of incarceration has caused her to be without his "essential parental care, control or subsistence," and that termination of his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) is proper. Furthermore, there has been no evidence of a bond between Father and N████, no contact between Father and N████, and Father has not demonstrated his intent to preserve his parental rights while incarcerated. Thus, this Court concludes that no parent-child relationship exists between Father and N████, and that termination of Father's parental rights will have no detrimental effect on the child.

Additionally, this Court finds by clear and convincing evidence that N████ was adjudicated dependent nearly 4 years ago, and as part of a voluntary agreement with FCCYS, she was placed in care of Foster Parents. It is clear that certain conditions that led to N████'s placement into foster care continue to exist. Furthermore, it is clear that termination of Mother's parental rights, and her impending adoption by Foster Parents,

15

would best serve the needs and welfare of N████. Thus, termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) is proper.

This Court recognizes that "the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and children." *In re Bowman*, 666 A.2d 274, 280 (Pa. 1995) (*citing In re Adoption of Michael J.C.*, 473 A.2d 1021, 1026 (Pa. Super. 1984), *reversed on other grounds*, 486 A.2d 371 (Pa. 1984)). However, it is clear that the circumstances that led to N████'s placement continue to exist; after nearly 4 years in placement, N████ requires permanency in the care of her Foster Parents, who have played a pivotal role in addressing N████'s developmental, physical, and emotional needs. For all of the above reasons, the Court enters the following Order:

16